UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
------------------------------------------------------------x
INTERNATIONAL BROTHERHOOD OF
ELECTRICAL WORKERS,
LOCAL 589, AFL-CIO

                        Plaintiff,

            - against -

LONG ISLAND RAIL ROAD,

                      Defendant.
------------------------------------------------------------x

**MEMORANDUM & ORDER**

24-CV-2620 (PKC) (MMH)

PAMELA K. CHEN, United States District Judge:

      Plaintiff International Brotherhood of Electrical Workers, Local Union 589, AFL-CIO ("IBEW" or "Plaintiff"), a labor organization, initiated this action against the Long Island Rail Road ("LIRR" or "Defendant"), a commuter rail system in the southeastern part of New York State, challenging the dismissal of one of its members, Darren Drew ("Drew") under the Railway Labor Act ("RLA"), 45 U.S.C. § 153. Plaintiff now seeks to vacate the arbitration award, arguing that Drew's dismissal and the arbitration adjudication that followed violated the parties' collective bargaining agreement ("CBA"), Drew's and IBEW's due process rights, and public policy. Pending before the Court is Defendant's motion to dismiss this matter in its entirety. For the reasons set forth below, Defendant's motion is granted.

# BACKGROUND

## I.    The Removal[1]

On or about June 7, 2022, Drew, who had been on medical leave for approximately four months, submitted to a return-to-duty physical examination, which included a drug test.[2]  (First Am. Compl. ("FAC"), Dkt. 14, ¶¶ 1, 16–17.)  On or about June 12, 2022, Medical Review Officer ("MRO")[3] Mohammad Mujtaba ("Dr. Mujtaba") received Drew's test result, which reported marijuana metabolites at 31 ng/mL.  (*Id.* ¶¶ 29–30.)  On June 13, 2022, Dr. Mujtaba informed Drew of the test result.  (*Id.* ¶ 35.)  Drew denied marijuana use and thereafter provided Dr. Mujtaba letters from Drew's treating physicians advising that Drew's test result might have been "attributable to his use of ibuprofen."  (*Id.*)  Dr. Mujtaba did not contact any of Drew's treating physicians.  (*Id.*)  The same day, before receiving a list of Drew's medications, Dr. Mujtaba reported Drew's test result to LIRR "as a verified positive."  (*Id.* ¶ 36.)  LIRR removed Drew from service that day "without further investigation."  (*Id.* ¶ 37.)

Rule 53 of the parties' CBA governs Drew's removal.  (*See id.* ¶ 40.)  It provides that "[e]mployees will not be suspended nor dismissed from service without a fair and impartial trial."

---

[1] In deciding Defendant's motion, the Court accepts as true all non-conclusory factual allegations in Plaintiff's First Amended Complaint.  *See Sacerdote v. N.Y. Univ.*, 9 F.4th 95, 106–07 (2d Cir. 2021) (citing *Palin v. N.Y. Times Co.*, 940 F.3d 804, 809 (2d Cir. 2019)).  In addition to the facts alleged in the First Amended Complaint, the Court also considers "documents attached to the complaint as exhibits, and documents incorporated by reference in the complaint."  *See DiFolco v. MSNBC Cable L.L.C.*, 622 F.3d 104, 111 (2d Cir. 2010) (citations omitted).

[2] Plaintiff alleges, and Defendant does not contest, that while federal regulation may require drug testing of certain employees, such regulations do not apply here, and that Drew's drug test was performed pursuant only to LIRR's return-to-duty policy.  (FAC, Dkt. 14, ¶¶ 14, 19, 21.)

[3] Under federal regulations, the MRO acts as "an independent and impartial 'gatekeeper' and advocate for the accuracy and integrity of the drug testing process."  49 CFR § 40.123(G).

(*Id.*; Rule 53, Dkt. 19-5, at ECF[4] 4.)    Additionally, Rule 53(b) of the CBA provides seven "offenses" that would justify pre-investigation suspension of employees.  (*Id.*)  These offenses include "unsafe practices" and being "under the influence of alcohol or narcotics while on duty."[5] (*Id.*)

## II.    The Hearing

Plaintiff contested Drew's termination at an internal "trial" before an LIRR Hearing Officer.[6]  (Def.'s Mem. Supp. Mot. Dismiss ("Def.'s Mem."), Dkt. 19-35, at 4.)  During the trial, Hearing Officer Seth Maggiore ("Maggiore") imposed procedural restrictions, including suppressing the involvement of IBEW's legal counsel and limiting the witness questions by IBEW's advocate.  (FAC, Dkt. 14, ¶¶ 45–49.)  According to Plaintiff, Maggiore also asked witnesses leading and compound questions.  (*Id.* ¶¶ 51, 56.)  When Drew protested his lack of access to laboratory documentation concerning the drug test, Maggiore stated that Drew "would have to continue to wait until the LIRR chose to disclose that evidence."  (*Id.* ¶¶ 57–58.)

---

[4] Citations to "ECF" refer to the pagination generated by the Court's CM/ECF docketing system and not, where available, the document's internal pagination.

[5] The full text of the Rule 53 provisions discussed reads,

(a) Employees will not be suspended nor dismissed from service without a fair and impartial trial.

(b) The following types of offenses justify pre-investigation suspension when there is sufficient reason to believe the employee is guilty of the offense and that he/she might commit the offense again if not withheld from service: (1) theft; (2) unsafe practices; (3) serious insubordination; (4) threatening or abusive conduct; (5) fighting on duty or on Carrier property; (6) under the influence of alcohol or narcotics while on duty; (7) rape, assault or other serious criminal activities.

(FAC, Dkt. 14, ¶ 40; Rule 53, Dkt. 19-5, at ECF 4.)

[6] Labor disputes in the railway industry are relatively unique in that they first go through an internal factfinding proceeding before moving on to an arbitrator.  (*See* FAC, Dkt. 14, ¶ 43.)

LIRR Senior Manager Corinne Swicicki ("Swicicki") testified at the trial. (*Id.* ¶ 52.) According to Plaintiff, Swicicki was the "sole management representative identified as responsible for the suspension and termination of Mr. Drew," and the person "responsible for the interpretation and application of the parties' CBA." (*Id.*) Swicicki testified that "none of the enumerated exceptions in Rule 53(b) . . . applied to Mr. Drew's suspension" and that Drew's pre-investigation suspension was justified only because of language in Rule 53(b) that permitted pre-trial suspension where retention of the employee could be "detrimental to themselves, another person, or the carrier." (*Id.* ¶¶ 52–53; *see also* Trial Tr., Dkt. 19-13, at 87:11–90:10, 95:21–96:10.) However, according to Plaintiff, Rule 53(b) contains no such language, and Swicicki relied upon an incorrect version of the rule, which was introduced at trial.[7] (FAC, Dkt. 14, ¶ 86.)

On August 3, 2023, Defendant rendered its decision to terminate Drew. (*Id.* ¶¶ 60, 62.)

## III.    The Board Adjudication and Award

IBEW appealed to a special board of adjustment ("the Board"), established by the parties pursuant to 45 U.S.C. § 153, Second, challenging both Drew's pre-investigation suspension on June 13, 2023, and Drew's termination on August 3, 2023. (*See id.* ¶ 64.) The Board was made up of a neutral member Michael Capone ("Capone"), IBEW member Ricardo Sanchez ("Sanchez"), and LIRR member Kelli N. Coughlin ("Coughlin"). (*Id.* ¶¶ 7, 74.)

---

[7] The FAC fails to explain how an incorrect version of the CBA, seemingly critical to the case, was introduced, used, and relied upon by both sides throughout the trial. Neither party identifies the origin of the "detrimental" language. The first time the error appears to have been noticed was during a later adjudication before an arbitrator, as discussed *infra*, Part III. Plaintiff claims that the incorrect version of the CBA was jointly introduced by the parties, while Defendant blames Plaintiff. (FAC, Dkt. 14, ¶ 86; Def.'s Mem., Dkt. 19-35, at 4–5.) Rule 53 in the incorrect CBA contains all of the enumerated exceptions to the rule that are in the correct CBA, *plus* additional ones that are not in the correct CBA, such as "detrimental to themselves, another person, or *the* carrier." (*Compare* FAC, Dkt. 14, ¶ 86, *with id.* ¶ 40; Rule 53, Dkt. 19-5, at ECF 4).)

The Board held a hearing on January 24, 2023. (Special Board of Adjustment Award No. 2 ("Award"), Dkt. 14-1, at 1.) At the hearing, IBEW objected to Coughlin acting as both LIRR advocate and a Board member.[8] (FAC, Dkt. 14, ¶¶ 80, 93; *see also id.* ¶¶ 92–94 (noting Plaintiff's reiterated objections).) IBEW also challenged Drew's positive test result based on Defendant's alleged failure to comply with federal regulations. (*Id.* ¶¶ 96, 102–108.) And—seemingly for the first time—IBEW raised the issue of Swicicki relying on an erroneous version of Rule 53(b) during her testimony. (*Id.* ¶¶ 85–86.)

On February 26, 2024, the Board issued its decision (the "Award"). (*Id.* ¶ 3; Award, Dkt. 14-1, at 9; *see generally id.*) The Board found that Defendant had met its burden to "prove . . . with substantial evidence" that Drew had violated LIRR policy. (*Id.* at 2–3 (explaining that "substantial evidence" is "more than a mere scintilla, and 'relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" (quoting *Consol. Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938))).) But the Board found that the "discipline imposed," i.e., termination, was "excessive." (*Id.* at 2.)

In finding that Defendant had provided substantial evidence of Drew's violation of LIRR policy, the Board credited Drew's positive test result and the testimony of Dr. Mujtaba, Swicicki, and Assistant Director of Employee Services Christopher Yodice.[9] (*Id.* at 3.) Regarding Drew's pre-trial suspension, the Board rejected IBEW's "claim that [LIRR] violated Rule 53 when it removed [Drew] from service on June 13, 2022, before conducting 'a fair and impartial trial',"

---

[8] There is no transcript of the Board hearing, and the Board did not engage in further evidence-gathering. (*See* FAC, Dkt. 14, ¶¶ 78–79.) The Board instead relied on the record from the LIRR internal trial before Hearing Officer Maggiore. (*See id.*)

[9] The Board's Award is the first time Yodice's testimony is mentioned in Plaintiff's First Amended Complaint filings.

finding that claim unsupported by the record.  (*Id.* at 5.)  After reciting the incorrect version of

Rule 53, the Board explained its finding that LIRR had properly suspended Drew on June 13, 2022:

> It is "beyond the pale" that a positive drug test in the industry is a "major offense".
> [IBEW] relies, in part, on Senior Manager, Manpower Resource Management
> Corinne Swicicki's testimony that none of the seven criteria in Rule 53(b) apply to
> [Drew].   However, Ms. Swicicki also testified that she believed the "pre-
> investigation suspension" was appropriate under Rule 53(b) wherein an employee
> may be held out of service if they could be "detrimental to themselves, another
> person, or [LIRR]."  Moreover, the on-property record confirms that on August 18,
> 2022, [LIRR's] Chief Mechanical Officer[10] responded to [IBEW's] claim "EL-02-
> 22" regarding [Drew], confirming that he was removed from service in accordance
> with Rule 53(b) for committing an "unsafe practice".  We find [LIRR] did not
> violate Rule 53 when it determined that a "pre-investigation suspension" was
> appropriate where it considered [Drew's] positive drug test result as "detrimental"
> and an "unsafe practice" by a safety-sensitive electrician.

(*Id.* at 5–6.)

The Board also found that it could not review Plaintiff's claim that the trial had not been

"fair and impartial" because the argument "was not addressed" during trial.  (*Id.* at 4.)  Further,

the Board stated that even if it did review Hearing Officer Maggiore's findings, it would confirm

the finding that Dr. Mujtaba "did not act improperly or contrary to federal regulations."  (*Id.* at 4;

*see also id.* at 6–7 (expanding on the ground for this conclusion).)[11]

However, as mentioned above, the Board found that the penalty of dismissal was

"arbitrary" and "excessive" and that Drew should be allowed to return to LIRR with a penalty of

"time-served without pay."[12]  (*Id.* at 8–9.)

---

[10] No name is provided for LIRR's Chief Mechanical Officer in the Award or elsewhere in Plaintiff's filings before the Court.  It does not appear that Yodice is that person.

[11] The Board also rejected IBEW's arguments about LIRR's alleged failure to comply with 49 C.F.R. Part 40.  (*Id*. at 6–7.)

[12] The Board's Award required Drew to meet certain preconditions before returning to work, including meeting a LIRR test for fitness for duty and "any requirements set forth by the [Employee Assistance Professional] before returning to service."  (Award, Dkt. 14-1, at 8–9.)

## IV.    Procedural History

Plaintiff filed the FAC on July 19, 2024.  (FAC, Dkt. 14.)  On August 9, 2024, Defendant moved to dismiss the FAC, (Dkt. 17), after the Court denied Defendant's request for a pre-motion conference.  (*See* 05/31/2024 Dkt. Order; 08/02/2024 Dkt. Order.)

## LEGAL STANDARD

To survive a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6), "a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Hogan v. Fischer*, 738 F.3d 509, 514 (2d Cir. 2013) (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)).  In assessing a complaint's sufficiency, a court "must construe [the complaint] liberally, accepting all factual allegations therein as true and drawing all reasonable inferences in the plaintiff['s] favor." *Sacerdote*, 9 F.4th at 106–07 (citing *Palin*, 940 F.3d at 809).  "A claim is plausible 'when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged.'" *Matson v. Bd. of Educ.*, 631 F.3d 57, 63 (2d Cir. 2011) (quoting *Iqbal*, 556 U.S. at 678).  Although the court must assume that all factual allegations contained in the complaint are true, this solicitude "does not extend 'to legal conclusions.  Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice.'" *Roe v. St. John's Univ.*, 91 F.4th 643, 651 (2d Cir. 2024) (quoting *Iqbal*, 556 U.S. at 678)).

## STATUTORY BACKGROUND

## I.    The Railroad Labor Act

Congress passed the RLA in 1926 to "prevent service interruptions in the transportation industries by encouraging labor peace and avoiding strikes." *Atlas Air, Inc. v. Int'l Bhd. of Teamsters*, 943 F.3d 568, 573 (2d Cir. 2019); *Detroit & T.S.L.R. Co. v. United Transp. Union*, 396 U.S. 142, 148 (1969).  Since a 1966 amendment, the RLA allows for the formation of "special

adjustment boards" responsible for settling grievances arising from major company agreements and policies and incidentally from workers' employment. *Ollman v. Special Bd. Of Adjustment No. 1063*, 527 F.3d 239, 245 (2d Cir. 2008); *Atlas Air Inc.*, 943 F.3d at 573. These boards consist of a three-person panel: one member chosen by the employer (the "carrier"), one by the representative of the employees, and one neutral member. 45 U.S.C. § 153, Second; *see Ollman*, 527 F.3d at 246.

The role of the Court in reviewing a special adjustment board is narrow. *See Skidmore v. Consol. Rail Corp.*, 619 F.2d 157, 159 (2d Cir. 1979) ("[R]eview afforded by the Railway Labor Act is 'among the narrowest known to the law.'" (quoting *Denver and Rio Grande W. R.R. Co. v. Blackett*, 538 F.2d 291, 293 (10th Cir. 1976)). "An adjustment board's award is binding on the parties and is enforceable in U.S. district court." *Ollman*, 527 F.3d at 246 (citing 45 U.S.C. §§ 153 First (p), Second). Under the RLA, judicial review is available only where "the court finds that the Board has failed to comply with the requirements of the RLA, that the Board has exceeded its jurisdiction, or that a member of the Board has engaged in fraud or corruption." *Ollman*, 527 F.3d at 246; *see CSX Transp., Inc. v. United Transp. Union*, 879 F.2d 990, 1003 (2d Cir. 1989) (quoting 45 U.S.C. § 153 First (q)). The Second Circuit also provides for judicial review on the grounds of due process and public policy. *Int'l Ass'n of Machinists & Aerospace Workers v. Metro–North Commuter R.R.*, 24 F.3d 369, 371 (2d Cir. 1994); *Loc. 97, Int'l Bhd. of Elec. Workers, A.F.L.-C.I.O. v. Niagara Mohawk Power Corp.* ("*Niagara II*"), 196 F.3d 117, 125 (2d Cir. 1999) (citations omitted); *Dominguez v. Miller*, No. 12-CV-0231 (CBA) (LB), 2013 WL 703193, at *9 (E.D.N.Y. Jan. 18, 2013) (citations omitted), *R&R adopted*, 2013 WL 703176 (E.D.N.Y. Feb. 26, 2013)

## II.    New York's Marihuana Law

On March 31, 2021, New York's legislature passed into law the Marihuana Regulation and Taxation Act ("MRTA"), finding that "existing marihuana laws have not been beneficial to the

welfare of the general public" and generally prohibiting employers from disciplining employees based on their use of marijuana.  MRTA's Section 9-a, codified as N.Y. Labor Law ("Labor Law") § 201-d (2); N.Y. Cannabis Law § 127 (4).  The MRTA includes exceptions, such as where the employer's actions are required by state or federal law.  MRTA, Section 9-b; Labor Law § 201-d (4-a); *see also* Labor Law § 201-d (4) (providing non-MRTA exceptions for discipline pursuant to collective bargaining agreements and employer policies).

## DISCUSSION

### I.    Plaintiff's First and Fourth Causes of Action Must be Dismissed

Plaintiff alleges two causes of action on the basis that the Board "exceeded its jurisdiction" with the Award.  (*See* FAC, Dkt. 14, ¶¶ 121, 130.)  The FAC's First Cause of Action asserts that the Board "exceeded its jurisdiction and dispensed its own brand of industrial justice by basing its decision on purported contractual language that did not exist in the CBA."  (*Id.* ¶ 121).  In the FAC's Fourth Cause of Action, Plaintiff claims that the Board exceeded its jurisdiction "by allocating the burden of proof of discrediting the test result to [IBEW] rather than requiring [LIRR] to submit substantial evidence of the test's accuracy and compliance with mandated protocols."  (*Id.* ¶ 130.)

####    A.    Standard of Review

In resolving labor disputes, the Court must "determine 'whether the arbitrator acted within the scope of his authority as defined by the collective bargaining agreement.'"  *Chelsea Grand, LLC v. N.Y. Hotel & Motel Trades Council, AFL-CIO*, 729 F. App'x 33, 38 (2d Cir. 2018) (quoting *N.Y.C. & Vicinity Dist. Council of United Bhd. of Carpenters & Joiners of Am. v. Ass'n of Wall-Ceiling & Carpentry Indus. of N.Y., Inc.*, 826 F.3d 611, 618 (2d Cir. 2016)).  The review under the RLA is "among the narrowest known to the law" and "must be extremely limited."  *United Transp. Union v. Nat'l R.R. Passenger Corp.*, 588 F.3d 805, 810 (2d Cir. 2009) (citations omitted).  Courts

ask only "whether the arbitrators did the job they were told to do—not whether they did it well, or correctly, or reasonably, but simply whether they did it." *Id.* (quoting *CSX Transp., Inc.*, 950 F.2d at 877). "The federal courts . . . may not substitute their judgments for those of the Board . . . . They need not inquire whether substantial evidence supports the Board's awards." *Id.*

The Board's authority is both derived from and limited by the CBA, *see Trans World Airlines, Inc. v. Sinicropi*, 887 F. Supp. 595, 614 (S.D.N.Y. 1995), *aff'd*, 84 F.3d 116 (2d Cir. 1996) (citing *Leed Architectural Prods., Inc. v. United Steelworkers of Am., Local 6674,* 916 F.2d 63, 65 (2d Cir. 1990), and "as long as the '[Board] was even arguably construing or applying the contract and acting within the scope of [its] authority and did not ignore the plain language of the [CBA],' the award should ordinarily be confirmed." *N.Y.C. & Vicinity Dist. Council*, 826 F.3d at 618. "An award should be enforced, 'despite a court's disagreement with it on the merits, if there is a *barely colorable justification* for the outcome reached.'" *Smarter Tools Inc. v. Chongqing SENCI Imp. & Exp. Trade Co.*, 57 F.4th 372, 383 (2d Cir. 2023) (quoting *T.Co Metals, LLC v. Dempsey Pipe & Supply, Inc.*, 592 F.3d 329, 339 (2d Cir. 2010)); *see Harry Hoffman Printing, Inc. v. Graphic Commc'ns Int'l Union, Loc. 261*, 950 F.2d 95, 98 (2d Cir. 1991) (noting that an award should be confirmed even if a court thinks it is a "serious error" (quoting *Leed Architectural Prods., Inc.*, 916 F.2d at 65). Misinterpretations of the contract and improvident, even silly, factfinding do not provide a basis for a reviewing court to enforce the award. *See Tully Constr. Co. v. Canam Steel Corp.*, 684 F. App'x 24, 27 (2d Cir. 2017) (quoting *Major League Baseball Players Ass'n v. Garvey*, 532 U.S. 504, 509 (2001)); *Fleischer v. Barnard Coll.*, No. 20-4213, 2021 WL 5365581, at *3 (2d Cir. Nov. 18, 2021) (summary order) (quoting same).

B.      The First Cause of Action

Plaintiff's First Cause of Action alleges that the Board exceeded its jurisdiction by relying on the incorrect version of Rule 53.  (FAC, Dkt. 14, ¶¶ 119–21.)  In moving to dismiss this claim, Defendant argues that the Award "sets forth multiple well-reasoned explanations for its decision," including the Chief Mechanical Officer's statement that Drew was removed from service for engaging in an "unsafe practice," one of the reasons listed in the correct version of Rule 53.  (Def.'s Mem., Dkt. 19-35, at 10–11; *see* Def.'s Reply, Dkt. 20, at 2.)  Plaintiff responds that the incorrect version of Rule 53 was "essential" to the Board's analysis and "colors the consideration of the remainder of the provision," having led the Board to ignore "clear testimony" that Drew had not engaged in an "unsafe practice."  (Pl.'s Opp'n, Dkt. 21, at 10–11.)

As a starting point, the Court finds, based on the language in the Award itself, that the Board upheld Drew's pre-investigation suspension under *both* the correct and incorrect versions of Rule 53, relying in part on Swicicki's testimony that Drew's conduct was "detrimental" under the invalid version of Rule 53, and in part on the statement of LIRR's Chief Mechanical Officer that Drew was removed for engaging in "unsafe practices."  (*Compare* FAC, Dkt. 14, ¶ 67, *with* Award, Dkt. 14-1, at 5–6.)

The questions remaining for the Court, then, are (1) whether the Board's partial reliance on the incorrect version of Rule 53 and Swicicki's testimony about "detrimental" conduct is separable from the Board's understanding of "unsafe practices" under the correct version of Rule 53; and if not, (2) whether the remaining independent justification for Drew's suspension is sufficient to preclude *vacatur* of the Award.

1.      Whether the Board's understanding of "unsafe practices" was affected by its reliance on the wrong version of Rule 53

Plaintiff argues that the Board's use of the wrong version of Rule 53 cannot be separated from its interpretation of "unsafe practices" because the wrong version is "essential" to the analysis and "colors" the Board's consideration.  (Pl.'s Opp'n, Dkt. 21, at 10.)  This argument finds no support in the text of the Award, which establishes that the Board's consideration of the two versions can be, and was, in fact, separate.  (*See* Award, Dkt. 14-1, at 5–6.)  That is especially clear when looking to the evidence the Board cited in explaining its decision, particularly the statement of LIRR's Chief Mechanical Officer, which exclusively concerns "unsafe practices."  (*Id.*)

It is true that the Board relied on some evidence that touches on both Rule 53 versions. The Board relied on Swicicki's testimony in part, and Swicicki's testimony was in turn based on the incorrect version of Rule 53.  (*See id.*; Pl.'s Opp'n, Dkt. 21, at 10–11.)  But that alone does not make the Award dependent on the extraneous language.  The Board understood that Swicicki testified, in effect, that Drew had not engaged in an "unsafe practice," but that he had still engaged in "detrimental" conduct.[13]  (*See* Award, Dkt. 14-1, at 5–6 (noting "Swicicki's testimony that none of the seven criteria [including 'unsafe practices'] apply to [Drew].").)  Nonetheless, the Board found that "a 'pre-investigation suspension' was appropriate where [Defendant] considered [Drew's] positive drug test result as "detrimental" *and* an 'unsafe practice' by a safety-sensitive electrician."  (*Id.* at 6 (emphasis added).)  Had the Board's understanding of the CBA been guided or influenced by Swicicki's testimony as Plaintiff now argues, the Board would not have approved Drew's suspension on the basis that he had engaged in an "unsafe practice," because that finding directly contradicted Swicicki's testimony.  Instead, the Board's explanation as to the bases of its

---

[13] Although Plaintiff claims "[t]he Award fails to acknowledge Swicicki's admission that *none* of Rule 53(b)'s seven exceptions were applicable," (Pl.'s Opp'n, Dkt. 21 at 10 (citing FAC, Dkt. 14, ¶¶ 54, 73, 82)), the Board explicitly cited Swicicki's testimony that "none of the seven criteria in Rule 53(b) apply."  (Award, Dkt. 14-1, at 5–6.)

conclusion demonstrates that it engaged in its own assessment to determine the record supported LIRR's conclusion that Drew had engaged in "unsafe practices" and/or "detrimental" conduct. (*See, e.g.*, Award, Dkt. 14-1, at 5-6 (noting that LIRR's Chief Mechanical Officer confirmed that Drew had been "removed from service in accordance with Rule 53(b) for committing an 'unsafe practice[.]'").)

The Court thus rejects Plaintiff's argument that the wrong version of Rule 53 "color[ed]" all of the Board's conclusions. (Pl.'s Opp'n, Dkt. 21, at 10.)

### 2.    Whether the remaining independent justification for the Award was sufficient

The next question is whether the Board's ratification of Drew's pre-investigation suspension for "unsafe practices" was a valid one, based on reasons independent from the Board's reliance on the wrong version of Rule 53. Plaintiff contends that without the improper reliance on the wrong version of Rule 53, the Board lacked valid evidence to confirm Drew's suspension.[14] (*See* Pl.'s Opp'n, Dkt. 21, at 10–11.) The Court disagrees.

---

[14] Plaintiff argues that interpreting off-duty marijuana use during a four-month medical leave as an "unsafe work practice" "defies all reason." (Opp'n, Dkt. 21, at 10.) Indeed, to the extent the Board might have failed to distinguish between on- and off-duty conduct in finding that Plaintiff had engaged in "unsafe practices," the Board's reading of Rule 53 might not be the most intuitive. Swicicki testified that Drew's alleged marijuana consumption was not an "unsafe practice." And the Rule 53 exception that explicitly discusses drug use provides that the employer must have been "under the influence of alcohol or narcotics *while on duty*," (FAC, Dkt. 14, ¶ 40; Rule 53, Dkt. 19-5, at ECF 4 (emphasis added)). Principles of contract interpretation could support the conclusion that having "under the influence of alcohol or narcotics while on duty" as an enumerated reason suggests that "unsafe practices" as another enumerated reason does not include off-duty consumption of marijuana.

But the Court cannot perform *de novo* review; it must defer to the Board. In reviewing a labor arbitrator's award, "[n]either a misapplication of principles of contractual interpretation nor an erroneous interpretation of the agreement in question constitutes grounds for vacatur." *Harry Hoffman Printing, Inc.*, 950 F.2d at 99 (citing *United Paperworkers Int'l Union v. Misco, Inc.*, 484 U.S. 29, 38 (1987)). Even if the Court finds the Award "irrational" or "bizarre," it cannot vacate the Award when the Board is "construing a contract and acting within the scope of [its] authority."

a)    <u>The Board construed the contract</u>

Despite the lack of extensive analysis by the Board, the Award's text establishes that the Board confirmed Drew's pre-investigation suspension based on the LIRR Chief Mechanical Officer's statement that Drew had engaged in an unsafe practice, which is one of Rule 53(b)'s enumerated suspension grounds.  (*See* Award, Dkt. 14-1 at 5–6); *see also Harry Hoffman Printing, Inc.*, 950 F.2d at 98 ("Merely because an arbitral decision is not based on the express terms of a collective bargaining agreement does not mean that it is not properly derived from the agreement.").  Plaintiff argues that the testimony of one LIRR employee, Swicicki, in itself provides a sufficient basis to interpret the CBA as foreclosing the alleged marijuana use as an "unsafe practice."  (*See* Pl.'s Opp'n, Dkt. 21, at 11.)  The other side of that coin, however, is that the Board was entitled to rely instead on a different LIRR employee's statement (as it did) to find the same alleged conduct to be an "unsafe practice."  (*See* Award, Dkt. 14-1, at 5–6 (crediting the Chief Mechanical Officer's report)).  However minimal the ground for its interpretation of the contract is, the Board need only show that it was doing its job to interpret the contract, and the reliance on the report provides at least that much.  *See Nat'l R.R. Passenger Corp.*, 588 F.3d at 810 ("[Federal courts] ask only whether the arbitrators did the job they were told to do." (quoting *CSX Transp., Inc.*, 950 F.2d at 877)); *Creasey v. Metro-North Commuter*, 269 F. App'x 75, 75 (2d Cir. 2008) (summary order) (requiring party seeking *vacatur* to "show that [the Board] failed to construe the CBA."); *see also Smarter Tools Inc.*, 57 F.4th at 378–79 (requiring only that labor arbitrators show a "barely colorable justification" (quoting *D.H. Blair & Co.*, 462 F.3d at 110)).

---

*Garvey*, 532 U.S. 504 at 510 (first citing *Garvey v. Roberts*, 203 F.3d 580, 590-91 (9th Cir. 2000); and then citing *Misco.*, 484 U.S. at 38).  Further, the Award need not be expansive in its reasoning, and it "should be confirmed 'if a ground for the arbitrator's decision can be inferred from the facts of the case.'"  *Smarter Tools Inc.*, 57 F.4th at 379 (quoting *D.H. Blair & Co.*, 462 F.3d at 110).

b)    The Board's consideration of "extra-contractual sources"

Plaintiff also argues that the Board's consideration of, and reliance on, "extra-contractual sources" in interpreting the CBA renders the Award invalid.  (Opp'n, Dkt. 21, at 10–11.)  While Plaintiff focuses on the wrong version of Rule 53 as an extra-contractual source of interpretation, the LIRR Chief Mechanical Officer's report, because it is also not part of the CBA, arguably qualifies as a second extra-contractual source of interpretation, especially as to the term "unsafe practices" under Rule 53.

Regarding the LIRR Chief Mechanical Officer's report, the Court finds that any reliance by the Board on LIRR's interpretation of "unsafe practices," in itself, was proper.  The term "unsafe practices" is an ambiguous and broad one, the scope of definition of which can be informed by LIRR's understanding and application of it.  And the Board "did not ignore the plain language of the contract." *N.Y.C. & Vicinity Dist. Council*, 826 F.3d at 618.  Rather, the Board's reference to "unsafe practices" and the seven enumerated reasons in the Award, (*see* Award, Dkt. 14-1, at 5–6), establishes that the Board understood the relevant section of the contract, even if the Board considered this information in the context of the wrong version of Rule 53, which includes more exceptions to Rule 53 than the correct CBA.  Although Plaintiff's preferred interpretation of Rule 53 may be irreconcilable with the Award, that does not mean that the interpretation adopted by the Board ignores the text of the CBA or is erroneous.

*Harry Hoffman Printing Co.*, on which Plaintiff relies, provides a useful point of contrast here.  950 F.2d at 95.  The CBA in that case allowed employees to adhere to other unions' picket lines at their individual discretion; the employer nonetheless permanently replaced some of the employees who honored one such picket line. *See id.* at 97.  The arbitration panel decided that the employees "did not act at their individual discretion," but rather because of "concerted activity"

15

of their union, and that they were therefore replaced in accordance with the explicit terms of the CBA. *Id.* Still, the panel decided that the employer violated the CBA because a lack of notice by the employer was a violation of the "fundamental right of due process." *Id.* The Second Circuit recognized that labor arbitrators have broad ability to interpret a CBA, including at times the ability to go beyond the express terms and draw on "contract principles," "industry custom and practices," and "parties' past practices." *See id.* at 98–99 (collecting cases). In *Harry Hoffman Printing Co.*, however, the court found that none of the CBA provisions that the panel had relied on provided for as broad a concept as "due process." *See id.*

The *Harry Hoffman Printing Co.* court was careful to explain how the arbitration panel violated the contract despite law providing for expansive deference to arbitrators. First, it made clear that the panel had not "base[d] any part of its decision" on the provisions of the CBA concerning notice requirements. *See id.* at 99. Second, it distinguished its award from cases involving CBAs with "broad, contractual language" that could compel courts to find that the award was "drawn from the essence" of the CBA. *See id.* at 100 (pointing to "just cause" as one example of such "broad, contractual language" (citations omitted)). Both distinctions are relevant here: unlike that panel, the Board expressly pointed to valid text in the operative CBA as the basis for its decision. (Award, Dkt. 14-1, at 5–6.) To the extent it looked elsewhere, the Board did so to interpret a contractual term—"unsafe practices"—that is ambiguous on its face, i.e., "broad, contractual language." *See also CSX Transp., Inc.*, 950 F.2d at 878 (finding "no violation of the board's jurisdiction" where the court must defer to arbitrators' contractual conclusions, and where "provisions in question are hardly unambiguous" (citations omitted)).

The Court turns to Plaintiff's argument that because the Board relied on two non-CBA sources of interpretation—the wrong version of Rule 53 and the LIRR's finding of "unsafe

practices" as to Drew's positive drug test—it lacked a sufficient basis to confirm Drew's suspension. The parties point the Court to different cases in support of their positions. Defendant argues that the Court should adopt the reasoning of two decisions, *Brentwood Medical Associates v. United Mine Workers of America*, 396 F.3d 237 (3d Cir. 2005) and *McCabe Hamilton & Renny Co. v. International Longshore and Warehouse Union, Local 142, AFL-CIO*, 624 F.Supp.2d 1236 (D. Hawaii 2008). *Brentwood* concerned an award by a labor arbitrator over an agreement that expressly denied arbitrators the ability to modify the agreement's provisions. 396 F.3d at 239. As here, the arbitrator relied on language that was not in the agreement in addressing an employee grievance. *Id.* at 240. The Third Circuit upheld the arbitrator's decision, finding that the extraneous language was not "the only leg" supporting the decision, despite the language providing "the clearest support for the arbitrator's conclusion." *See id.* at 241, 243. The decision stated that the court had to "resist the urge to conduct *de novo* review of the award on the merits" and needed only to test the award, without the aberrant language, for whether "there is sufficient substance in the remainder of the discussion to pass the minimum rationality threshold."[15] *Id.* at 242–43. The panel concluded that it did. *Id.*

The dispute in *McCabe* similarly involved an arbitrator's reliance on an employer's policy, which was not expressly part of the parties' CBA. 624 F. Supp. 2d at 1247. In *McCabe*, the district court did not expressly conclude that this reliance was improper, but ruled that even if it were, the

---

[15] Even the dissent by Judge Thomas L. Ambro recognized that courts "uphold arbitration awards but for snow in August." *Id.* at 246 (Ambro, J., dissenting). One of the dissent's primary disagreements with the majority was whether the aberrant language "informed the arbitrator's belief" and "tipped the balance" in the arbitrator's decision that the employer had violated the CBA. *Id.* at 245. No like contradiction is found here, however, for the extraneous elements in the erroneous version of Rule 53 were independent from the Board's consideration of "unsafe practices." *See* discussion at Part I.B.1 *supra*.

policy "was simply one component that informed the Arbitrator's decision."[16]  *Id.*  It noted that "[a]n arbitrator's decision can be upheld even if the arbitrator relied on multiple theories, one of which exceeds the scope of the arbitrator's authority." *Id.* (quoting *United Steelworkers of Am. v. Enter. Wheel & Car Corp.*, 363 U.S. at 597–98 (1960)).  Thus, both *Brentwood* and *McCabe* support a finding that the Award should stand, despite the Board's reliance on extra-contractual considerations.

Plaintiff, however, would have the Court instead follow *Armstrong County Memorial Hospital v. United Steel, Paper and Forestry, Rubber, Manufacturing, Energy, Allied Industrial and Service Workers International Union*, 419 F. App'x 217 (3d Cir. 2011).  In *Armstrong*, the court reviewed an arbitrator's decision finding that the employer's implementation of a new policy prohibiting employees from smoking on hospital property was improper because the employer had failed to consider the employees' rights as established by past practice. *Id.* at 219–20.  This time, the Third Circuit upheld the district court's *vacatur* of the arbitrator's decision. *Id.* at 223.  The panel noted that the CBA reserved to the employer the right to establish "reasonable policies" and found that the arbitrator based his decision on terms "never use[d]" by the CBA, "gave no indication" he was interpreting the CBA, and ultimately rendered a decision so in conflict with the CBA that he "effectively rewrote the parties' agreement." *See id.* at 221–22.

However, the Court need not choose between the cases cited by the parties.  *Armstrong* does not dictate a different result in this case than *Brentwood* or *McCabe*.  The Court does not read *Armstrong* to establish that the Court cannot uphold a decision that has at least a valid justification for its conclusion; rather that decision concerned an arbitration decision that was entirely premised

---

[16] Though the court entertained the party's argument that turning to employer policy was impermissible, the court found that "the Arbitrator was certainly allowed to look to matters outside the CBA to inform his interpretation of the CBA." *Id.* at 1247–48.

on reasoning extraneous to the CBA and in conflict with its express terms. *Armstrong* is therefore materially distinguishable from both *Brentwood* and *McCabe*, the facts *and* reasoning of which more closely apply here—particularly the former. As in *Brentwood*, here, the arbitration decision at issue is partly premised on extraneous language that the arbitrator erroneously believed was part of the parties' contract, namely, the wrong version of Rule 53. But, just as in *Brentwood*, the Court has concluded that the arbitrator, i.e., the Board, relied on alternative, independent, and sufficient grounds for its decision. Although those grounds included the other extra-contractual source of interpretation—the Chief Mechanical Officer's interpretation of "unsafe practices"—as discussed, the Award demonstrates the Board's understanding of the relevant sections of the CBA, in particular, the seven grounds for disciplinary action enumerated in Rule 53. As *Brentwood* establishes, this is enough for the Court to affirm the Award.

Accordingly, Plaintiff's First Cause of Action is dismissed.

C.    The Fourth Cause of Action

Plaintiff's Fourth Cause of Action alleges that the Board exceeded its jurisdiction "by allocating the burden of proof of discrediting the test result to [IBEW] rather than requiring [LIRR] to submit substantial evidence of the test's accuracy and compliance with mandated protocols." (FAC, Dkt. 14, ¶ 130.) This claim fails for similar reasons the Plaintiff's First Cause of Action must be dismissed, namely, that the Court must defer to the Board's implementation of the CBA, unless the Board's choices were in direct conflict with the CBA's plain meaning. *See CSX Transp. Inc.*, 950 F.2d at 878 (citations omitted).

The Award clearly states that the Board held Defendant to a "substantial evidence" burden of proof. (Award, Dkt. 14-1, at 2–3.) In interpreting what "substantial evidence" requires, the Board looked to Supreme Court precedent defining the term and industry practice. (*See id.* at 3

(quoting *Consol. Edison Co.*, 305 U.S. at 229, for the proposition that "substantial evidence" constitutes "more than a mere scintilla, and 'relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'"; *id.* (looking to the industry's "legions of arbitral authority" to conclude the standard "require[d] the moving party to provide relevant material evidence by which a reasonable mind can find support for the conclusion asserted.").) These sources of interpretation—industry and judicial precedent—are undoubtedly reasonable and permissible, especially in interpreting an ambiguous term like "substantial evidence." *See Harry Hoffman*, 950 F.2d at 98–99. Furthermore, this interpretation "did not ignore the plain language of" the CBA, and it, no doubt, "arguably constru[ed]" the CBA, *N.Y.C. & Vicinity Dist. Council*, 826 F.3d at 618. Accordingly, the Court finds that the Board's interpretation of the "substantial evidence" standard did not exceed the Board's jurisdiction.

In its application of the standard, the Board considered "[t]he documentary evidence and testimony of . . . Swicicki, . . . Dr. Mohammad Mujtaba, and Assistant Director, Employee Services Christopher Yodice" to support its conclusion. (Award, Dkt. 14-1, at 3.) It further reviewed the timeline of the tests confirmed by Dr. Mujtaba. (*Id.*) All of this evidence is rationally supportive of the Board's conclusion. The Board also considered Defendant's contrary arguments and evidence, including Drew's testimony that he did not ingest or use marijuana, but found "no basis" to credit the possibility of the tests being a "false positive." (*Id.* at 3–4.) Although Plaintiff seeks to characterize this process as shifting the burden onto Plaintiff to prove that Drew's positive test result was unreliable, (FAC, Dkt. 14, ¶ 130), that is patently incorrect. While the Board certainly considered both sides' arguments and evidence—as was appropriate—the Award made clear that the burden of proof remained at all times on Defendant. (Award, Dkt. 14-1, at 2.)

Given this reasoning and the supporting evidence before the Board, it is clear there was at least "a barely colorable justification" and an application of the CBA in the Board's conclusion that there was substantial evidence to decide Drew had tested positive for marijuana use. *Smarter Tools*, 57 F.4th at 383 (citations omitted). The Court need not inquire any further. *See Nat'l R.R. Passenger Corp.*, 588 F.3d at 810 ("The federal courts . . . need not inquire whether substantial evidence supports the Board's awards."). Accordingly, the Court finds that the Board's application of the "substantial evidence" standard to be within the Board's jurisdiction.

Though concerning the FMLA and not the RLA, *National Hockey League v. National Hockey League Players' Association*, provides a useful parallel. No. 16-CV-4287 (AJN), 2017 WL 1030718, (S.D.N.Y. Mar. 15, 2017). There, plaintiff, the National Hockey League ("NHL") argued a labor arbitrator had "made no effort to be faithful" to the "substantial evidence" standard described in the NHL's contract with defendant, a players' union. *See id.* at *8. Applying a deferential review standard, the court found the arbitrator's interpretation permissible as it was "at least 'arguable'" that the arbitrator had applied the parties' bargained-for agreement. *Id.* The Court found the arbitrator's interpretation of "substantial evidence" was "reasonabl[e]" and "unquestionably arguable." *See id.* at *9–10. As to the arbitrator's application of that standard, the court recognized that, even if "no reasonable arbitrator could possibly, on the basis of the record . . ., have reached the Arbitrator's decision," the court was "not authorized to review the arbitrator's decision on the merits despite allegations that the decision rests on factual errors." *Id.* at *11 (citation omitted).

Here, too, Plaintiff challenges the arbitrator's interpretation and application of the "substantial evidence" standard, claiming the resolution of the factual question—whether Defendant met the requirement of substantial evidence—should be overturned by the Court for the

alleged failure to satisfy the standard.  But as the court in *Nat'l Hockey League* did, the Court must defer to the Board's application of the standard to the evidence in front of it.  Even if the Court thought the merits should be decided differently, it "may not substitute [its] judgments for those of the Board."  *See Nat'l R.R. Passenger Corp.*, 588 F.3d at 810.

Thus, the Court concludes that the Board acted within its jurisdiction in finding that Drew had tested positive for marijuana use.  Simply put, the Board did its job.  *See id.* at 810 (citations omitted).  Accordingly, Defendant's Fourth Cause of Action is dismissed.

## II.    Plaintiff's Second and Third Causes of Action Must be Dismissed

Plaintiff alleges two causes of action on the basis that the Board violated Drew's and IBEW's "due process rights."  (*See* FAC, Dkt. 14, ¶¶ 122–27.)  Plaintiff's Second Cause of Action states that "[t]he Board violated fundamental due process requirements of the [RLA] by permitting [LIRR]-appointed Board member [Coughlin] to act in the dual role of advocate and Board member[,] which requires the *vacatur* of the Award."  (*Id.* ¶ 124.)  As for its Third Cause of Action, Plaintiff claims that the actions taken by LIRR during the trial before Hearing Officer Maggiore violated Plaintiff's and Drew's "due process rights under the [RLA] and their contractual right to a fair and impartial hearing as required by Rule 53 of the CBA."  (*Id.* ¶ 127.)

### A.    The Second Cause of Action

Plaintiff premises its challenge to Coughlin's Board membership on the basis that "a fundamental precept of due process has been that an interested party in a dispute cannot also sit as a decision-maker."  (*Id.* ¶ 124 (quoting *Int'l Ass'n of Machinists & Aerospace Workers v. Metro-North Commuter R.R.* ("*IAM*"), 24 F.3d 369, 371 (2d Cir. 1994)).)  The parties disagree as to whether *IAM* controls this case.  *IAM* concerned an arbitration between an employer, Metro-North Commuter Railroad, and two railroad unions, the International Association of Machinists and Aerospace Workers ("IAM") and the Transport Workers Union ("TWU").  *Id.* at 370.  The

arbitration was done by a division of the National Railroad Adjustment Board ("NRAB"), an alternative under the RLA to the Special Board of Adjustment ("SBA") the parties chose in this case. *See id.* The NRAB in *IAM* was composed of five management members appointed by the railroad companies and five labor members appointed by national railroad unions. *Id.* at 370–71. In the *IAM* arbitration, one of the NRAB members was an employee of IAM, one of the unions involved in the dispute. *Id.* The employee was a voting member of the NRAB division hearing the arbitration, had signed IAM's brief to the division, was "one of the two members of the subpanel formed to make findings in the dispute," and "actively voted to deadlock the dispute and to send it to a referee." *Id.* at 371–72. The Circuit Court decided that the employee's participation at "crucial stages" in a "star-crossed proceeding" violated the due process of the other union, TWU. *See id.* at 370.

Defendant distinguishes *IAM* on the basis that the instant case concerns an SBA, not a division of the NRAB. (Def.'s Mem., Dkt. 19-35, at 21.) Plaintiff claims this is a "distinction without difference," and that the two are, "in all material respects, the same." (Pl.'s Opp'n, Dkt. 21, at 18, 21.) Defendant also notes that the neutral member (and Chairman of the Board) permitted Coughlin's Board participation. (Def.'s Mem., Dkt. 19-35, at 19–20; *see also* FAC, Dkt. 14, ¶¶ 64, 80, 93–94 (describing the neutral member's rejection of Defendant's objections).)

The Court finds that *IAM* does not apply here. Unlike that case, this one concerns only two parties (instead of three), each of which had equal representation on the Board. *See* 24 F.3d at 370. This is a critical distinction because in *IAM*, only one of the two unions involved in the arbitration had an employee on the Board, on the findings subpanel, and in the vote to deadlock the dispute. *Id.* IAM was thus afforded greater representation during "crucial stages" of the arbitration compared to TWU, the union whose due process rights that court found to have been violated. *Id.*

23

*IAM*'s reasoning underscores the difference between its facts and a more standard labor dispute between two parties—an employer and a union or an employee—where it is expected that each Board member will typically be partisan towards their appointer.[17]  *See id.* (recognizing it was a "fact of life" that boards composed of members chosen in equal parts by the unions and by the railroads will "*always*" deadlock and require a neutral referee).  Accordingly, *IAM* is distinguishable and does not control this case.

"[D]ue process is flexible and calls for such procedural protections as the particular situation demands." *Ciambriello v. Cnty. of Nassau*, 292 F.3d 307, 319 (2d Cir. 2002) (quoting *Mathews v. Eldridge*, 424 U.S. 319, 334 (1976)).  "In the arbitration context, due process typically requires no more than the provision of a fair hearing, which generally requires giving each party 'sufficient opportunity to prepare its case . . . and to present pertinent evidence in support of its case.'" *Smith v. Am. Eagle Airlines, Inc.*, No. 07-CV-3363 (NG) (RER), 2008 WL 2600857, at *4 (E.D.N.Y. July 1, 2008) (quoting *NLRB v. Wash. Heights Mental Health Council, Inc.*, 897 F.2d 1238, 1244-45 (2d Cir. 1990)); *Russell v. Am. Eagle Airlines, Inc.*, No. 07-CV-4119 (NG) (RER), 2008 WL 2600856, at *4 (E.D.N.Y. July 1, 2008) (same); *see Dominguez*, 2013 WL 703193, at *9.

Here, there is no basis to find that IBEW's or Drew's due process rights were violated during the arbitration.  Sanchez, who had been appointed by IBEW, was an equal Board member, along with Coughlin and Cooper.  (FAC, Dkt. 14, ¶¶ 74, 77.)  Sanchez was an IBEW advocate, having been one of the union's two representatives during Drew's investigative hearings.  (*Id.* ¶ 48.)  Plaintiff pleads no facts as to how Coughlin prevented Plaintiff from presenting its case

---

[17] As the Seventh Circuit noted, *IAM*'s applicability is limited by, *inter alia*, by its lack of discussion of how much the unions were able to participate in the arbitration as interested parties. *Int'l Bhd. of Elec. Workers v. CSX Transp., Inc.*, 446 F.3d 714, 720 n.3 (7th Cir. 2006).

in the Board hearings.  It complains only that Coughlin was partisan towards LIRR—that is, that Coughlin "sat beside" and communicated with LIRR's attorneys, while Sanchez "sat at a distance" from IBEW's representatives.  (*Id.* ¶¶ 91–92.)  Although Plaintiff has called this a violation of Coughlin's "obligation, under the [RLA], to conduct herself in a fair and impartial manner," (*id.* ¶ 93), Plaintiff's objection to Coughlin's participation was overruled by the neutral member, (*id.* ¶¶ 80, 94), and the RLA's own terms provide that the members of the Board will be representatives of their appointers.  *See, e.g.*, 45 U.S.C. § 153, Second ("Each member of the board shall be compensated by the party he is to represent.")  Plaintiff had its own representative on the Board in Sanchez, who was presumably given the same ability to sit and communicate with Plaintiff's advocates as Coughlin had with Defendant's advocates, even if Sanchez did not.

Because Plaintiff had equal representation in the Board's membership and does not allege any facts suggesting that Coughlin inhibited Plaintiff's ability to present its case before the Board, the Court finds that Plaintiff cannot show that either Plaintiff's or Drew's due process rights were violated and dismisses Plaintiff's Second Cause of Action.

## B.    The Third Cause of Action

In its Third Cause of Action, Plaintiff claims that IBEW and Drew were deprived of a "fair and impartial" trial before Hearing Officer Maggiore.  (*See* Pl.'s Opp'n, Dkt. 21, at 22–23.) Specifically, Plaintiff points to Maggiore's restrictions on the trial and allegedly leading questions. (*Id.*)  But "only due process claims arising from Board actions invoke federal review." *Dominguez*, 2013 WL 703193, at *8 (collecting cases); *see also Williams v. Metro-North R.R.*, No. 17-CV-3092 (KMK), 2020 WL 1489832, at *10 (S.D.N.Y. Mar. 27, 2020), *aff'd sub nom. Williams v. MTA Metro N. R.R.*, No. 20-CV-3418, 2022 WL 1053265 (2d Cir. Apr. 8, 2022)

25

(same).  Plaintiff concedes this general rule, but claims that it should be set aside here because Plaintiff lacked an "opportunity for post-deprivation review."  (Pl.'s Opp'n, Dkt. 21, at 22–23.)

The Court rejects Plaintiff's invitation to enter "uncharted jurisdictional waters." *Clemmons v. Hodes*, No. 15-CV-8975 (KPF), 2017 WL 4326111, at *7 (S.D.N.Y. Sep. 26, 2017). Even if the Court were to engage in the review requested by Plaintiff, CBA provisions for post-deprivation review procedures will typically defeat a due process claim. *See Adams v. Suozzi*, 517 F.3d 124, 128 (2d Cir. 2008) ("[T]here is no due process violation where . . . the deprivation at issue can be fully remedied through the grievance procedures provided for in a [CBA]." (collecting cases)).  The CBA provided for such a review, of which Plaintiff availed itself by having the Board review the trial's decision.  Plaintiff now broadly claims that Coughlin's participation deprived Drew and Plaintiff of "an adequate opportunity to address" their trial grievances, but does not provide the Court with sufficient factual matter support a due process claim under the relevant standard.  (Pl.'s Opp'n, Dkt. 21, at 23.)

Accordingly, Plaintiff's Third Cause of Action is dismissed.  *See Hogan*, 738 F.3d at 514.

## III.  Plaintiff's Fifth Cause of Action Must be Dismissed

### A.  Legal Background

Finally, Plaintiff asks the Court to vacate the Award on the grounds that it violated "clearly defined public policy" and New York State law.  (FAC, Dkt. 14, ¶¶ 113–18, 131–133.)  While the Court may vacate an arbitral award on public policy grounds, that exception is "extremely limited," and Plaintiff bears the burden of establishing those grounds. *Niagara II*, 196 F.3d at 125.  Plaintiff must establish that "the policy is one that specifically militates against the relief ordered by the arbitrator." *Id.* (quoting *Int'l Bhd. of Elec. Workers, Loc. 97 v. Niagara Mohawk Power Corp.* ("*Niagara I*"), 143 F.3d 704, 716 (2d Cir. 1998) (itself quoting *Misco*, 484 U.S. at 44)).  Public policy questions are ultimately resolved by the courts, but courts cannot simply disagree with the

arbitrator about the proper remedy and "must determine 'whether the award itself . . . create[s] [an] explicit conflict with other laws and legal precedent and thus clearly violates an identifiable public policy.'" *Niagara Mohawk II*, 196 F.3d at 125 (quoting *Niagara Mohawk I*, 143 F.3d at 716).  The question for the Court, then, is whether the Board's conclusion that Drew engaged in an "unsafe practice" under the parties' CBA creates an "explicit conflict" and "clearly violates" an "identifiable" public policy determined by laws and legal precedent.

For this claim, Plaintiff relies on New York's MRTA, which was signed into law a year before Drew's drug test.  (FAC, Dkt. 14, ¶ 113.)  Plaintiff argues that the MRTA "prohibits an employer from disciplining employees based on their use of marijuana."  (*Id.* ¶ 114.)  Plaintiff relies on the MRTA's Section 9-a, codified as Labor Law § 201-d (2), which provides, in relevant part, that "it shall be unlawful for any employer . . . to discharge from employment or otherwise discriminate against an individual in compensation, promotion or terms, conditions or privileges of employment because of . . . an individual's legal use of consumable products, including cannabis in accordance with state law, prior to the beginning or after the conclusion of the employee's work hours, and off of the employer's premises and without use of the employer's equipment or other property."  Labor Law § 201-d (2); (*see* FAC, Dkt. 14, ¶¶ 113–14).

In response, Defendant points to Labor Law § 201-d (4), which provides that "an employer shall not be in violation [of Labor Law § 201-d (2)] where the employer takes action based on the belief either that . . . the employer's actions were permissible pursuant to an established substance abuse or alcohol program or workplace policy, professional contract or *collective bargaining agreement*."  (*See* Def.'s Mem., Dkt. 19-35, at 24 (emphasis added).)  Plaintiff counters that Labor Law § 201-d (4) has been superseded by the passage of the MRTA and that Act's own list of exceptions, codified as Labor Law § 201-d (4-a).  (*See* Pl.'s Opp'n, Dkt. 21, at 24); Labor

Law § 201-d (4-a) (exempting employer actions required by law or regulation, or when the employee is impaired by the use of cannabis).  The parties also disagree as to whether the CBA waived Drew's marijuana consumption rights under New York law.  (*Compare* Def.'s Mem., Dkt. 19-35, at 24–25, *with* Pl.'s Opp'n, Dkt. 21, at 24–25).

In reviewing New York law, the Court is bound by the decisions of the New York Court of Appeals and considers state intermediate appellate court decisions as "helpful indicators of how the state's highest court would rule."  *Licci ex rel. Licci v. Lebanese Canadian Bank, SAL*, 739 F.3d 45, 48 (2d Cir. 2013) (first citing *Comm'r v. Estate of Bosch*, 387 U.S. 456, 464 (1967), then quoting *DiBella v. Hopkins*, 403 F.3d 102, 112 (2d Cir. 2005)); *see Chufen Chen v. Dunkin' Brands, Inc.*, 954 F.3d 492, 499 (2d Cir. 2020).  The Court "will look to [state intermediate appellate] decisions unless convinced by other persuasive data that the highest court of the state would decide otherwise."  *Licci*, 739 at 48 (quoting *DiBella*, 403 F.3d at 112) (internal quotation marks and citation omitted); *AEI Life LLC v. Lincoln Benefit Life Co.*, 892 F.3d 126, 139 n.15 (2d Cir. 2018) (quoting *Pahuta v. Massey–Ferguson, Inc.*, 170 F.3d 125, 134 (2d Cir. 1999)).  Persuasive data includes other state intermediate appellate court decisions, *see Buie v. United States*, No. 05-CR-0664 (RCC), 2017 WL 3995597, at *6–7 (S.D.N.Y. Sep. 8, 2017), legislative intent, *see Stevens v. Webb*, No. 12-CV-2909 (KAM), 2014 WL 1154246, at *10–11 (E.D.N.Y. Mar. 21, 2014), new legal developments, *see Comolli v. Huntington Learning Ctrs., Inc.*, 117 F. Supp. 3d 343, 352 (S.D.N.Y. 2015), "decisions in other jurisdictions on the same or analogous issues," *In re Thelen LLP*, 736 F.3d 213, 219 (2d Cir. 2013) (quoting *Maska U.S., Inc. v. Kansa Gen. Ins. Co.*, 198 F.3d 74, 78 (2d Cir. 1999)), and any "other sources the state's highest court might rely upon in deciding the question," *Tantaros v. Fox News Network, LLC*, 12 F.4th 135, 142 n.22 (2d Cir. 2021) (quoting *DiBella*, 403 F.3d at 112).

B.    <u>Analysis</u>

The only case cited by the parties interpreting Labor Law § 201-d (4-a) is *Moran-Ruiz v. Ontario County*, in which the court rejected Plaintiff's interpretation of New York law.  193 N.Y.S.3d 829, 829 (4th Dep't 2023).  There, the Fourth Department, Appellate Division reviewed the placement of any employee on unpaid leave for using marijuana, where the governing CBA included a provision prohibiting marijuana use.  *Id.*  The *Moran-Ruiz* court specifically rejected Plaintiff's interpretation of Labor Law § 201-d (4-a), finding that "the exemption contained in . . . § 201-d (4-a) does not conflict with the exception contained in . . . § 201-d (4) and merely provides an *additional* basis for an employer to justify actions that would otherwise be discriminatory."  *Id.*  The decision in *Moran-Ruiz* is supported by the text of Labor Law § 201-d (4-a), which recognizes, and does not explicitly nullify, Labor Law § 201-d (4).  At the outset, Labor Law § 201-d (4-a) states: "*Notwithstanding the provisions of subdivision three or four of this section*, . . . ." (emphasis added).

Even assuming for the sake of argument that *Moran-Ruiz* does not represent the current state of the law in New York regarding Labor Law § 201-d (4-a), the Court must still find additional "persuasive data" to depart from that decision's interpretation.  Plaintiff offers no such data, and the Court has not identified any either.  Plaintiff has thus failed to meet its requisite burden of establishing an "identifiable" public policy "that specifically militates against the relief ordered by the arbitrator."  *Niagara Mohawk II*, 196 F.3d at 125; *see Doe v. Gooding*, No. 20-CV-6569 (PAC), 2022 WL 1104750, at *3 (S.D.N.Y. Apr. 13, 2022) (finding "no persuasive data" when party offered only their interpretation of preemption law, which had been rejected by a state intermediate appellate court).  Deferring to *Moran-Ruiz*'s conclusion that Labor Law § 201-d (4-a) applies to MRTA employee protections, as it must, the Court can find no

"explicit conflict" between an Award based on a CBA breach and a public policy that, as defined by statute and precedent, provides employers the ability to take disciplinary action against their employees based on marijuana use that violates a CBA or employer policy.[18]  *See Niagara II*, 196 F.3d at 125.

Plaintiff, however, argues that even if Labor Law § 201-d (4-a) is the operative list of exceptions, the exceptions must not apply where the CBA predates the MRTA, for New York law requires "express indicia of waiver" that cannot be met through contractual silence.[19]  (*See* Pl.'s Opp'n, Dkt. 21, at 24–25.)  This argument is misplaced.  Plaintiff's argument goes towards the proper way to interpret the parties' CBA; it does not answer whether Labor Law § 201-d (4) is superseded by Labor Law § 201-d (4-a).  To the extent Plaintiff tries to connect the two issues, it seeks to put the Court in an untenable position.  To find that the Award violated public policy under this theory, the Court would have to find that the CBA does not apply here—that is, that the Board's finding that "unsafe practices" may include off-duty marijuana consumption is a violation of the CBA.  That argument has been amply discussed and rejected *supra*.  The Court cannot avail itself of the public policy exception to review *de novo* a decision to which it must otherwise defer. *See Niagara I*, 143 F.3d at 716 (noting that, when reviewing an arbitrator's award for violation of

---

[18]  Because Plaintiff has failed to establish the public policy with which the Award purportedly conflicts, the Court finds it unnecessary to decide whether other public policy considerations, including federal interests over regulation of marijuana, would also preclude vacating the award on public policy grounds.

[19]  Plaintiff also argues that Labor Law § 201-d (4) cannot apply because LIRR's Alcohol and Drug Policy was "plainly superseded" by the MRTA.  (Pl.'s Opp'n, Dkt. 21, at 23–24).  That argument is circular.  The MRTA cannot have superseded the employer's ability to rely on its policy unless Labor Law § 201-d (4-a) superseded Labor Law § 201-d (4), which, as discussed, Plaintiff has failed to establish here.  Plaintiff also warns that Defendant's reading of the law would allow for employer policies to make the impact of Labor Law § 201-d (2) ineffective.  Indeed, but that consequence would be brought about by Labor Law § 201-d (4)'s list of exceptions—not this Court's decision.

public policy, "[a] court is not authorized to revisit or question the fact-finding or the reasoning which produced the award").

Accordingly, Plaintiff's Fifth Cause of Action is dismissed.

## CONCLUSION

For the reasons described herein, Defendant's motion to dismiss is granted and the First Amended Complaint is dismissed in its entirety pursuant to Federal Rule of Civil Procedure 12(b)(6). The Clerk of Court is respectfully requested to enter judgment accordingly and close this action.

SO ORDERED.

*/s/ Pamela K. Chen*
Pamela K. Chen
United States District Judge

Dated: September 30, 2025
Brooklyn, New York